UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DALE S. ROSS,                    )
                                 )
            Plaintiff,           )
                                 )
        vs.                      )      No. 4:06-CV-1525 (CEJ)
                                 )
MICHAEL J. ASTRUE[1],            )
Commissioner of Social           )
Security,                        )
                                 )
            Defendant.           )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I. Procedural History

Plaintiff Dale S. Ross filed an application for disability
insurance benefits under Title II of the Social Security Act and an
application for Supplemental Security Income Benefits under Title
XVI of the Social Security Act, claiming an onset date of disability
of November 12, 2003 following a work related injury. (Tr. 120).
Plaintiff alleged disability based on injuries to his left leg and
lumbar degenerative disc disease, status post lumbar fusion
surgeries. Plaintiff's application was denied administratively and
he requested a hearing from an Administrative Law Judge (ALJ). (Tr.
14, 92-98).

---

[1]Michael J. Astrue became the Commissioner of Social
Security on January 20, 2007. Pursuant to Rule 25(d)(1) of the
Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for Commissioner Jo Anne B. Barnhart as
Defendant in this suit. No further action need be taken to
continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

The hearing was conducted on December 29, 2005. Plaintiff was represented by his attorney. The ALJ issued a decision on June 12, 2006, denying plaintiff's claim. (Tr. 11-24). The Appeals Council denied plaintiff's request for review on September 27, 2006. (Tr. 6-8). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

Plaintiff was the only witness at the hearing. He testified that he lived with his girlfriend and fourteen-year-old daughter. (Tr. 29). He has an eleventh grade education and no GED. (Tr. 29). At the time of his injury, plaintiff was employed as a cable technician and field supervisor, and he received on-the-job training in the field of cable communications. (Tr. 29). Plaintiff had not taken any additional classes nor participated in vocational rehabilitation. (Tr. 30-31). The Plaintiff had never been in the military or incarcerated. (Tr. 31).

On February 28, 2003, plaintiff injured his back while picking up equipment for work. (Tr. 33, 203, 309). The plaintiff was officially laid off from his job in February 2004. (Tr. 30). He could not continue in his occupation as a cable technician because he could no longer lift the required weight. (Tr. 37). He also believed that potential employers would not hire him because of his fatigue, and his inability to sit or stand for long periods of time. (Tr. 40-41). At the time of the hearing his worker's compensation claim was pending. (Tr. 49).

Following his injury plaintiff complained of severe lower back pain. (Tr. 33-34). At the hearing before the ALJ, plaintiff testified that on November 13, 2003 he underwent a posterior L5-S1 fusion. (Tr. 302). Following the surgery plaintiff developed anterior left side thigh pain. (Tr. 290, 301). In addition, he complained of pain with change of positions from sitting to standing and lying down to sitting. (Tr. 298). He testified that "the fusion did not take," resulting in continued problems with his upper, middle and lower back. (Tr. 33). Plaintiff described his pain as "a very shooting pain above [his] pelvis area." He stated that it felt as if "somebody might have stabbed [him] in the back and left the knife in it." (Tr. 34).

Plaintiff stated that on average he sleeps only three to four hours a night because of the severity of his pain. (Tr. 38-39). He stated that he couldn't carry more than ten pounds, and could not sit or stand for lengthy periods of time. (Tr. 38). Plaintiff could provide only limited assistance with the household chores because of his inability to sit, stand or bend. (Tr. 43). His daughter and girlfriend did the cleaning, cooking and outdoor work (Tr. 43). Plaintiff testified that he had to sit in a chair to look in the refrigerator or cook a meal. (Tr. 43-44). He also testified that he experiences difficulty getting dressed, specifically putting on his shoes. (Tr. 47). When questioned about the medications he was taking, plaintiff testified that he took "Morphine[2] and Phenenol

---

[2]Morphine sulfate - MS Contin - is a controlled release tablet for relief of moderate to severe pain. It is intended for

[sic]". (Tr. 36-38). Plaintiff was able to walk approximately 1-1 ½ miles a day and drive an automobile. (Tr. 44-45, 48, 570). He was able to drive to church and to his children's school activities. (Tr. 48).

On April 14, 2005, plaintiff underwent anterior lumbar take down of pseudoarthrosis,[3] removal of interbody fusion cages and anterior interbody arthrodesis with an anterior lumbar plate and structural Allograft and iliac crest bone graft in an attempt to alleviate his back pain. (Tr. 546). Plaintiff continued to suffer back and leg pain following the second surgery. (Tr. 544).

Plaintiff's work-history self-report indicates that he worked as a cable technician and a relief operator in a factory. (Tr. 58-59).

### III.  Medical Evidence

On April 11, 2003 plaintiff had a MRI of the lumbar spine which indicated mild disc bulging at L4-L5. (Tr. 360). Plaintiff received a lumbar epidural steroid injection at left L5-S1 following

---

use in patients who require repeated dosing with potent opioid analgesics over periods of more than a few days. See Phys. Desk Ref. 2701-02 (61st ed. 2007).

[3]Psuedoarthrosis - syn. pseudarthrosis - is a new false joint arising at the site of an ununited fracture. Stedman's Med. Dict. 1469 (27th ed. 2000).

a diagnosis of L5-S1 stenosis[4] secondary to eccentric bulge to the left L5-S1 and lumbar spondylosis[5] involving the facet joint at L5-S1. (Tr. 357). Plaintiff had a sacroiliac injection for a L4-5 disk bulge, versus SI joint dysfunction. (Tr. 354). A CT of the lumbar spine with contrast on August 12, 2003, suggested a positive diskogram with pain during the injection of the L5-S1 disk space but little evidence of disk degeneration. (Tr. 350-352). The findings also suggested a radially oriented tear involving the left foraminal region of the L5-S1 disk space. (Tr. 350-51). On November 13, 2003, plaintiff underwent posterior spinal fusion with PLIF at L5-S1 as well as a L5-S1 laminectomy[6] and discectomy.[7] (Tr. 330). At that time plaintiff was diagnosed with severe degenerative disc disease.[8] During a postoperative examination on December 15, 2003 plaintiff complained of numbness in his anterior left thigh. (Tr. 301). Plaintiff described the pain as a "burning sensation" that he got when his leg was touched. (Tr. 301). Plaintiff's doctor, David

---

[4]Stenosis is a stricture of any canal or orifice. Stedman's Med. Dict. 1695 (27th ed. 2000).

[5]Spondylosis is ankylosis of the vertebra and is often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's Med. Dict. 1678 (27th ed. 2000).

[6]Laminectomy is the excision of a vertebral lamina; commonly used to denote removal of the posterior arch. Stedman's Med. Dict. 964 (27th ed. 2000).

[7]Discectomy is the excision in part or whole of an intervertebral disk. Stedman's Med. Dict. 508 (27th ed. 2000).

[8]Degenerative disc disease is a condition in which pain is caused from a damaged disc. Cedar-Sinai Hospital Health Conditions, http://www.csmc.edu/5757.html (last visited July 26, 2007).

Raskas, M.D., prescribed Neurontin[9] for this ailment. (Tr. 301).
Dr. Raskas allowed plaintiff to return to sedentary office work on
January 30, 2004, and to light duty office work on April 14, 2004.
(Tr. 300, 296).

Plaintiff was treated by Anthony H. Guarino, M.D., for pain
management beginning March 29, 2004. (Tr. 448). Plaintiff continued
to complain of back and lower extremity pain which was diagnosed as
meralgia paresthetica.[10] (Tr. 448-451). Plaintiff underwent a left
lateral femoral cutaneous nerve block on April 6, 2004, May 5, 2004
and July 15, 2004 with no lasting relief. (Tr. 445, 416). Dr.
Guarino prescribed Zonegran[11] and Ultracet[12] in April 2004, Bextra[13]

---

[9]Neurontin is indicated for the management of postherpetic
neuralgia in adults. See Phys. Desk Ref. 2487 (61st ed. 2007).

[10]Meralgia Paresthetica is burning pain, tingling, pruritis
or formication along the lateral aspect of the thigh in the
distribution of the lateral femoral cutaneous nerve due to
entrapment of that nerve; affected skin is often hyperesthetic.
Stedman's Med. Dict. 1093 (27th ed. 2000).

[11]Zonegran is an anti-seizure drug indicated as adjunctive
therapy in the treatment of partial seizures in adults with
epilepsy. See Phys. Desk Ref. 1101 (61st ed. 2007).

[12]Ultracet is used to treat moderate to severe pain for a
period of five days or less. It contains two pain-relieving
agents. Tramadol, known technically as an opioid analgesic, is a
narcotic pain reliever. Acetaminophen is the active ingredient
in the over-the-counter pain remedy Tylenol. Physicians Desk
Reference Online,
http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/ult1597.s
html (last visited July 26,2007).

[13]Valdecoxib (Bextra) is used to relieve the pain,
tenderness, inflammation (swelling), and stiffness caused by
arthritis and to treat painful menstrual periods. Valdecoxib is
in a class of nonsteroidal anti-inflammatory medications called
COX-2 inhibitors. It works by stopping the body's production of
a substance that causes pain and inflammation. Valdecoxib has
been taken off the market after research indicated that it put

and Zanaflex[14] in May 2004, Topamax[15] in July 2004, and a Lidoderm patch on July 15, 2004. (Tr. 443, 432, 427, 421). As of July 12, 2004, Dr. Raskas allowed plaintiff to work with the following restrictions: "1) Lift/carry restriction of 20 lbs; 2) squatting, bending, kneeling, pushing, pulling, climbing and reaching overhead occasionally; 3) Sitting, standing, walking to be done 0 to 2 hours at a time; 4) 0 to 2 hours total a day of standing; 5) 4 to 6 hours total a day of sitting; and 6) 2 to 4 hours total a day of walking." (Tr. 541).

Plaintiff's complaints of pain continued and he was prescribed the oral analgesic, Vicodin[16] in August 2004. (Tr. 411, 416). As a result of plaintiff's chronic pain and the amount of medication prescribed to alleviate his symptoms Dr. Guarino prescribed a

---

users at a higher risk for heart attack and stroke, among other conditions, without providing benefits greater than other readily available NSAIDs. Medmaster Patient Drug Information Database, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602011.htm l (last visited July 26, 2007).

[14]Zanaflex relaxes the tense, rigid muscles caused by spasticity. It is prescribed for people with multiple sclerosis, spinal cord injuries and other disorders that produce protracted muscles spasms. The effect of the drug peaks 1 to 2 hours after each dose and is gone within 3 to 6 hours. PDR Health (A division of Thomson Healthcare), http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/zan1638.s html. (last visited July 26, 2007).

[15]Topamax is used to treat certain types of seizures in patients with epilepsy. It is in a class of medications called anticonvulsants. Medmaster Drug Information Database, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697012.htm l. (last visited July 26, 2007).

[16]Vicodin is indicated for the relief of moderate to moderately severe pain. See Phys. Desk Ref. 535 (61st ed. 2007).

continuous relief patch of Fentanyl (Duragesic) on August 20, 2004.[17] (Tr. 411). On October 29, 2004, Dr. Guarino stopped plaintiff's oral intake of Vicodin and began a regimen of Actiq.[18] (Tr. 406).

Plaintiff had a CT of the lumbar spine with reconstructions on November 19, 2004 which showed a "mild diffusely bulging disk above the fusion at the L4-L5 level and [s]olid bony fusion was not observed". (Tr. 327). On November 22, 2004 Dr. Raskas observed that plaintiff had an unhealed fusion with very little bone incorporation. (Tr. 525). Plaintiff was given the option of undergoing an anterior fusion to repair the non-union; however, he was also apprised that his chance of significant relief was approximately 50/50. (Tr. 525).

Plaintiff underwent physical therapy from March 11, 2003 through March 20, 2003, April 18, 2003 through July 23, 2003, and March 24, 2004 through August 13, 2004, wherein he experienced

---

[17]Fentanyl (Duragesic) is a transdermal system providing continuous systematic delivery of Fentanyl, a potent opioid analgesic for 72 hours. Fentanyl is a schedule II opioid substance indicated for the management of persistent moderate to severe chronic pain that: 1) requires continuous round-the-clock opioid administration for an extended period of time; and 2) can't be managed by other means such as nonsteroidal analgesics, opioid combination products or immediate-release opioids. See Phys. Desk Ref. 2373 (61st ed. 2007).

[18]Actiq is indicated for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain. See Phys. Desk Ref. 979 (61st ed. 2007).

increased mobility but no alleviation of his back pain. (Tr. 202-288, 466-513).

On April 14, 2005 plaintiff underwent an anterior lumbar takedown of pseudoarthrosis, removal of interbody fusion cages and anterior interbody arthrodesis with an anterior lumbar plate and structural Allograft and iliac crest bone graft performed by James Coyle, M.D. (Tr. 546). Dr. Coyle instructed plaintiff to remain off work until July 27, 2005. (Tr. 568).

On June 28, 2005, plaintiff stated that "he [felt] as though his back [was] definitely more stable than it was prior to surgery," although he still had some anterior thigh pain. (Tr. 570). At that time plaintiff was taking oral morphine and utilizing the Fentanyl patch, and Dr. Coyle prescribed him Elavil[19] as well. (Tr. 572).

Plaintiff was able to walk 1-1 ½ miles a day in lieu of physical therapy. (Tr. 570,573). He expressed a desire to return to work three months after surgery, and was released with the following restrictions: "1) no lifting greater than 10 lbs; 2) no repetitive bending at the waist of greater than 30 degrees." (Tr. 567-568). By October 18, 2005, Dr. Coyle opined that while plaintiff still experienced "persistent low back pain on a daily basis" his "fusion appeared to be solidified." (Tr. 564). Plaintiff was prescribed Celebrex at this time. (Tr. 562).

---

[19]Elavil is indicated for the relief of mental depression, bulimia, chronic pain, migraine headaches and pathological weeping and laughing associated with multiple sclerosis. PDR Health (A division of Thomson Healthcare), http://www.pdrheath.com/drug_info/rxdrugprofiles/drugs/ela1155.shtml (last visited July 31, 2007).

Plaintiff was treated by Dr. Guarino for pain management from May 2005 until October 2005. (Tr. 577-596).

On January 20, 2006, plaintiff was seen by Patrick Hogan, M.D., a neurologist. (Tr. 597-604). Dr. Hogan opined that plaintiff had "some weakness of his left quadricepts, limitation of motion of his back and chronic pain." (Tr. 599). Dr. Hogan also noted plaintiff's 45-pound weight loss. (Tr. 597, 599). Plaintiff stated that other physicians believed that his weight loss was a result of chronic use of morphine sulfate. (Tr. 599). Dr. Hogan also completed a document entitled, Medical Source Statement of Ability to do Work Related Activities (Physical). (Tr. 601-604). In it, he opined that plaintiff's ability to lift/carry, push, pull, stand, sit or walk was affected by his impairment creating several exertional limitations. (Tr. 601-602). Plaintiff was never to climb, balance, kneel, crouch, crawl or stoop. (Tr. 602).

## IV. The ALJ's Decision

The ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2.  Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's lumbar degenerative disc disease and degenerative joint disease and left knee degenerative joint disease are "severe" impairments based on the requirements in the Regulations 20 CFR § 404.1520©.

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

- 10 -

5.   I find the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decisions.

6.   The claimant has the residual functional capacity to perform sedentary work, as detailed in the body of this decision, where he can perform work that requires involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools, work that is generally performed while seated, up to 6 hours in a regular 8-hour workday and sitting or standing, off and on, consistent with the ability to walk a mile to a mile and a half, where he is not expected to perform even occasional climbing, stooping, kneeling, crouching, crawling, or balancing movements.

7.   The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8.   The claimant is a "younger individual" (20 CFR § 404.1563).

9.   The claimant has "a limited education" (20 CFR § 404.1564).

10.   The transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.   The claimant has the residual functional capacity to perform the full range of sedentary work (20 CFR § 404.1567).

12.   Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.25.

13.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(g)).

(Tr. 22-23).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines

disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can,

he is not disabled.  Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A.  **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.  The ALJ's credibility findings;

2.  the plaintiff's vocational factors;

3.  the medical evidence;

4.  the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.  third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.    Plaintiff's Allegations of Error**

Plaintiff's appeal raises the following issues: (1) that the ALJ erred in failing to obtain the testimony of a vocational expert, and (2) that the ALJ did not properly assess the opinions of the treating physicians.

**1.    Vocational Expert Testimony**

Plaintiff contends that the ALJ was required to obtain the testimony of a vocational expert because the record established that he had significant nonexertional impairments; i.e., pain. Plaintiff also challenges the ALJ's finding that his subjective complaints of pain were not fully credible. The Court begins its analysis of this claim with a consideration of the credibility determination.

In Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), the Eighth Circuit articulated five factors for evaluating pain and other subjective complaints: "(1) the claimant's daily activities;

(2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions."

The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, the ALJ may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. Where an ALJ explicitly considers the Polaski factors but then discredits the plaintiff's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

Plaintiff's treating and examining physicians agree that he suffers from a severe impairment causing him chronic pain. While his mobility improved with treatment, his pain remained unabated throughout the record. "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has . . . taken only occasional pain medications." Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000); (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)); See Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998) (finding that plaintiff's consistent diagnosis of chronic lower back pain, coupled with a long history of pain management and drug therapy, including the implantation of the intrathecal morphine pump supported plaintiff's subjective complaints of pain). Here, plaintiff pursued several pain treatment modalities from 2003

including epidural injections, nerve blocks, two surgeries and was consistently taking medications prescribed for moderate to severe pain.  At the time of the hearing, plaintiff was taking 30 mg of morphine three times daily, and was using a 75 mg Fentanyl patch every three days. (Tr. 36-38).  He stated that the medications provided little relief.  The type and dosage of plaintiff's pain medication support his subjective complaints of pain.

"An ALJ who rejects a plaintiff's subjective complaints of pain must make an express credibility determination explaining the reasons for discrediting the complaints." Gramlisch v. Barnhart, 464 F. Supp.2d 876 (E.D.Mo 2006); (citing Singh v. Apfel, 222 F.3d at 452).  The ALJ did not explicitly discuss each Polaski factor, however, she considered some of the factors in her credibility analysis.  The ALJ considered the following factors significant in making her credibility determination.

The ALJ observed that plaintiff had a good work history and was suffering from a work-related injury.  See Jenkins v. Apfel, 196 D.3d 922, 926 (8th Cir. 1999)(finding that plaintiff's history of past hard work and current limited activities support his claims of disabling pain); See also Stewart v. Apfel, No. C03-3061, 2004 WL 736819, at *24 (N.D. Iowa April 6, 2004)(finding that plaintiff's work history supports her subjective allegations of disability when she continued to attempt to work at a variety of jobs despite problems due to pain and psychological conditions).  He did not apply for unemployment benefits.  The Eighth Circuit has held that "the acceptance of unemployment benefits, which entails an assertion

of the ability to work, is facially inconsistent with a claim of disability" Cox, 160 F.3d at 1208; See Salts v. Sullivan, 958 F.2d 840, 846 (8th Cir. 1992). However, "the negative impact cannot be uniformly or automatically applied in every case." Id. The ALJ also stated that plaintiff only looked for work in the cable industry and only at a rate of pay equal to that of the work he used to perform. This conclusion appears to be based upon the following testimony at the hearing:

> Q.   Did you try to get a light duty job at the cable company?
>
> A.   Yeah.  I actually tried to -- I went on Monster.com and put my referral out there just to see if I could get me an office type job or anything, and pretty much in my field, the cable world is a pretty small world and I believe, because of my injury, I feel like I've been eight-balled in the field.

(Tr. 40)

Plaintiff testified that "[he] want[s] to get better.  [He] had a nice career [he] thought [he] was doing.  [He] loved [his] job" and "[i]f [he felt] better one day, [he would] go back to work."  Additionally, the record shows that plaintiff told Dr. Coyle that he wanted to return to work.  The Court believes that the evidence does not support the conclusion that plaintiff was restricting his job search to the cable industry.  The Court finds that the ALJ mischaracterized the record in at least one instance and therefore, could not have made her credibility determination based on the whole of the evidence.

In reaching a decision regarding credibility, the ALJ relied on the opinions of Dr. Coyle and Dr. Hogan.  Dr. Coyle was

plaintiff's treating physician and Dr. Hogan was the consultative physician who performed an examination to determine his residual functional capacity. According to the ALJ, Dr. Coyle stated that plaintiff "was only looking for work that he could perform in the cable industry and that he had not found any jobs that he could perform with the limitations imposed by his doctors." (Tr. 20). On the contrary, Dr. Coyle merely stated that plaintiff had been released to work with some restrictions but that "[a]pparently work was not available for him." (Tr. 566). The doctor subsequently stated that a functional capacity evaluation would be helpful if there were any question about plaintiff's work capacity. Dr. Coyle's earlier opinion, and the restrictions he imposed, thus should have been treated as conditional.

Based on a functional capacity evaluation completed on January 20, 2006, Dr. Hogan found that plaintiff suffered from chronic pain and imposed several physical and postural restrictions. The ALJ adopted Dr. Hogan's restrictions on plaintiff's physical capacity but did not address his assessment of plaintiff's pain. In fact, the ALJ expressed the belief that Dr. Hogan's assessment was reflective of plaintiff's complaints of pain, as opposed to objective medical evidence. In fact, however, Dr. Hogan, a neurologist, conducted both an examination of the plaintiff and a review of his medical records. (Tr. 597-599). Plaintiff's subjective complaints of pain were consistent from the time of his injury. The medical evidence shows that plaintiff's physicians all believed that he was in severe pain. Plaintiff underwent pain

management with Dr. Guarino from March 2004 until February 2005 and May 2005 until October 2005. Plaintiff consistently sought and received medical treatment and pain management.

The ALJ also factored in plaintiff's ability to walk 1-1½ miles daily. However, the ALJ does not acknowledge that part of plaintiff's treatment was a walking program wherein plaintiff was instructed to walk 2 miles a day. (Tr. 573). Dr. Coyle prescribed the walking plan in lieu of physical therapy. The plaintiff complied with the medical treatment prescribed by his treating physician despite the left knee pain resulting from a previous meniscectomy. (Tr. 566).

The Court concludes that the ALJ did not properly support the decision to discredit plaintiff's complaints of disabling pain by pointing to actual inconsistencies in the record. Thus, the case must be remanded for further proceedings. If on remand it is determined that plaintiff's allegations of pain are credible, the Commissioner should determine whether the testimony of a vocational expert is required.

The Medical-Vocational Guidelines (Guidelines) are a matrix of general findings, established by rule, as to whether work exists in the national economy that a claimant can perform, taking into account age, education, work experience, and RFC. By comparing individual factors for a particular claimant to the general findings in the Guidelines, the ALJ can determine whether other work exists in the national economy. See 20 C.F.R. § 404.1520 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

When a claimant suffers only from exertional impairments and the ALJ's findings of RFC, age, education, and previous work experience coincide with the Guidelines, the ALJ may rely exclusively on the Guidelines to determine whether other work exists in the national economy. 20 C.F.R. § 404.1569a(b); see also Heckler v. Campbell, 461 U.S. 458, 468 (1983) (concluding that the use of occupational Guidelines does not violate the Social Security Act and stating that "[t]his type of general factual issue may be resolved as fairly through rulemaking as by introducing the testimony of vocational experts at each disability hearing.").

The Guidelines, however, do not purport to establish jobs that exist in the national economy for claimants who also suffer from non-exertional impairments. See 20 C.F.R. § 404.1569a(c)(2). The 8th Circuit has clearly set forth the rule with respect to the decision to call a vocational expert where there is a non-exertional impairment.

> Generally, if the claimant suffers from nonexertional impairments that limit [his] ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to utilize testimony of a vocational expert. The exception to this general rule is that the ALJ may exclusively rely on the guidelines even though there are nonexertional impairments if the ALJ finds, and the record supports the finding, that the nonexertional impairments do not *significantly* diminish the claimant's RFC [residual functional capacity] to perform the full range of activities listed in the guidelines.

Draper v. Barnhart, 425 F.3d 1127, 1132 (8th Cir. 2005). See also Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); (citing Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005)). Examples of

non-exertional impairments include hypertension, obesity, pain, and atherosclerotic heart disease. <u>Evans v. Chater</u>, 84 F.3d 1054, 1056 (8th Cir. 1998). <u>See</u> <u>also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 564 (8th Cir. 1991) (finding that pain is a non-exertional impairment). In addition, difficulty stooping, climbing, crawling, or crouching are non-exertional impairments. 20 C.F.R. Pt. 404 § 1569(a)(c)(vi) (2006).

In the case at bar, the plaintiff has a combination of exertional and non-exertional impairments. As established by the record as a whole, Plaintiff is unable to sit, stand or walk for extended periods of time without pain and has "difficulty performing the . . . postural functions of some work such as reaching, handling, stooping, climbing, crawling or crouching." 20 C.F.R. Pt. 404 § 1569(a)(c)(vi) (2006). This finding is consistent with the Medical Source Statement Of Ability To Do Work-Related Activities completed by Dr. Hogan on January 20, 2006. (Tr. 601-04). The ALJ found that the plaintiff had the residual functional capacity to do a wide range of sedentary work "where he is not expected to perform even occasional climbing, stooping, kneeling, crouching, crawling, or balancing movements" per Dr. Hogan's limitations. Such limitations may prevent the plaintiff from performing the full range of sedentary work as described in the guidelines. 20 C.F.R. Pt. 404, § 1567(a) (2006). Therefore, the ALJ's failure to call a vocational expert makes the record incomplete and requires this Court to remand for further proceedings.

## 2. **Opinions of Treating Physicians**

Plaintiff's second claim of error is that the ALJ gave controlling weight to the opinion of the medical consultant. Generally, the opinion of a treating physician is given controlling weight and deference over that of a consulting physician if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991). When an ALJ does not give controlling weight to the treating physician good reasons must be given in their notice of determination or decision for the weight given. 20 C.F.R. § 404.1527(d)(2); Gramlisch, 464 F.Supp.2d. at 881; (citing Singh 222 F.3d at 452). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh, 222 F.3d at 452 (quoting Kelley, 133 F.3d at 589).

Donald E. Edwards, M.D., of the disability determinations agency, examined plaintiff's medical records and determined his residual functional capacity. Dr. Edwards determined that plaintiff had severe physical impairments and that his allegations appeared credible. Dr. Edwards does not clearly determine plaintiff's physical exertion requirements. Instead, Dr. Edwards restates the opinion of Dr. David Raskas from April 14, 2004, that plaintiff was capable of work in light range, when at maximum improvement.

However, the record clearly establishes that plaintiff had not reached maximum improvement and in fact underwent an additional surgery to repair his unhealed fusion on April 14, 2005. Therefore, substantial weight cannot be given to Dr. Edwards' opinion because he was not in possession of all the medical evidence at the time of his evaluation and he did not physically examine the plaintiff.

The ALJ correctly stated that on July 26, 2005, Dr. Coyle opined that it would be reasonable for plaintiff to return to work as long as he was not lifting more than 10 pounds or doing any repetitive bending at the waist at greater than 30 degrees. However, he later stated on September 6, 2005, that if there was any question about plaintiffs work capacity, then a functional capacity evaluation would be helpful. Dr. Coyle also stated that he envisioned plaintiff working in a light to moderate capacity with lifting and bending restrictions when he reached maximum medical improvement. The record does not reflect plaintiff reaching maximum medical improvement. Instead, plaintiff continues to complain of improved but still severe pain in his lower back.

The functional capacity evaluation on January 20, 2006, showed that plaintiff was then undergoing pain management and that he had some weakness of his left quadriceps, limitation of motion of his back and chronic pain. Dr. Hogan's diagnoses were chronic low back pain with suspected arachnoiditis at the fusion site and two lumbosacral procedures, one posterior and one anterior for refusion. The ALJ stated that full consideration was given to all of the

evidence of record, but it is unclear from the decision how much weight was given to each physician and for what reasons. The assessments of Dr. Coyle and Dr. Hogan were well supported by medically acceptable clinical and laboratory diagnostic techniques. Therefore, further investigation is required to determine whether the ALJ gave the treating physician controlling weight.

## VI. Conclusion

For the foregoing reasons, the Court remands this case to the Commissioner for further proceedings. On remand, the ALJ should reassess the credibility of plaintiff's subjective complaints and, if supported by the evidence, obtain the testimony of a vocational expert. See 20 C.F.R. § 404.1520 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The ALJ should also state more clearly the weight given to each physician's assessment.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE
Dated this 24th day of March, 2008.